IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA                              PLAINTIFF

VERSUS                                        CAUSE NO.: 1:22CR69

JABARI EDWARDS                                       DEFENDANTS

## MOTION TO DISMISS FORFEITURE COUNTS AND SEIZURE OF PROPERTY

Comes now J5 GBL, LLC, J5 Solutions, LLC, Edwards Enterprises, LLC, The Bridge Group, LLC, BH Properties, LLC and Build Development Group, LLC, and move this Court to dismiss the forfeiture counts of the indictment against Jabari Edwards, the Defendant, and the seizure of property and accounts as to these corporate entities.

### OVERVIEW OF INDICTMENT

Jabari Edwards and Antwann Richardson, two senior managers of the above companies, were indicted for conspiracy to commit wire fraud, wire fraud, making a false statement or representation to an agency of the United States and money laundering. Mr. Edwards owns 100% of all the affiliated companies involved. In connection with these charges, the United States requested forfeiture of the assets of the movants herein. Further, all of the operating accounts of all movants were frozen, impeding their business operations and potential survival.

A review of the 13 count indictment shows that the underlying facts supporting the charges are essentially three claims,

1

specifically:

1) On or about January 10, 2021, one of the companies Edwards and Richardson managed, North Atlantic Securities (NAS), made false statements to qualify for a Paycheck Protection Program (PPP) loan in the amount of $567,522.50 (Exhibit 1, The Application.) The false statement they are said to have made was that "NAS had *85 employees* with a total payroll of $*227,009.00* when NAS's monthly payroll was approximately half that amount." (Paragraph 28, Indictment.) (Emphasis added.)

2) Starting on or about October 20, 2021, NAS obtained a series of Economic Injury Disaster Loans (EIDL) that totaled $2,000,000, by falsely certifying that "there has been no *substantial adverse changes* in borrower's financial condition ... since the date of the agreement for this loan", when the company had sold 'all of its assets and contracts." (Paragraph 24 and 33, Indictment.) [Emphasis added.]

3) Both the PPP and EIDL funds were spent in illegal ways.

These movants challenge these claims as they unduly and unlawfully burden and restrict the operations of their business.

## PPP LOAN APPLICATION

The January 10, 2021, NAS PPP loan application attached as Exhibit 1 shows the material representations made by the company

2

and its officers. In Exhibit 2, the Court will find the instructions as to what period should be used for calculations, where the SBA states "…most Applicants will use the average monthly payroll for 2019 or 2020." There were exceptions for businesses that had been opened for less that all of 2019.

This PPP draw was commonly called the "Second Draw." Representations and certifications had to be made by the borrower. Among those representations are ones which state: "I acknowledge that the lender will calculate the eligible loan amounts using tax documents I have submitted" and "affirm that these tax documents are identical to those I submitted to the IRS." (Exhibit 3, p. 1, final paragraph.)

NAS's tax return for 2019 is attached as Exhibit 4. Line 8 shows the total NAS salaries and wages for 2019 were \$2,724,868. Math takes one the rest of the way: $\$2,724,868 \div 12 \times 2.5 = \$567,522$. SBA instructions have been consistent as shown in Exhibit 5. ("…Second Draw PPP loan is 2.5x the average monthly 2019 or 2020 payroll cost up to \$2 million." The number of "jobs" at NAS in 2019 is not material to the amount of money the business received, rather this number goes to eligibility for the PPP, because the business can have "no more than 300 employees."

The government appears to misunderstand the application process and instructions from SBA. All material statements were correct based upon SBA instructions that 2019 numbers could be used, while the government uses post-pandemic job numbers from

3

2020 and 2021 as supporting the charges against Mr. Edwards. In fact, the only eligible tax return numbers that could have been used for these calculations were 2019 since the NAS 2020 tax returns had not yet been prepared or filed in January 2021 (the Second Draw).

Another misperception by the government is that there is an exact correlation between current payroll and the proper award of PPP. SBA guidelines require only that 60% of the funds be used for payroll expenses. When the government states the $227,009 monthly payroll of "NAS's payroll was approximately half that amount," it fails to state a violation of law or SBA regulation. (See Exhibit 6.)

As for the movant companies, other than NAS, they should not be under the cloud of forfeiture and seizure by the United State when clearly NAS rightfully obtained the PPP Loan.

### EIDL

The United States' claim that NAS illegally obtained the October 2021 $350,000.00 EIDL and November 2021 $1,500,000 (subsequently raised to $1,850,000) EIDL loans is based solely on the premise that NAS had sold all of its security guard contracts to former and existing employees on March 4, 2021, exiting entirely the security guard business. The government assumes this was a "substantial adverse change" without any basis or specific showing that the sale was a substantial adverse change, alleging only that

4

NAS "ceased doing business on March 4, 2021." (Paragraphs 40 and 42 Indictment)

Attached as Exhibit 7 are the 2018 and 2020 tax returns[1] of NAS, showing a cumulative loss of $1,453,649 and annual losses/gains as follows:

| | |
|---|---|
| 2018 | -$561,371 |
| 2019 | +$ 40,381 |
| 2020 | -$306,337 |
| 2021 | -$627,276 |

NAS had been losing money year after year on its security guard contracts. As the first step in transforming the company, the officers decided to exit the money-losing contracts, which is acknowledged. It is axiomatic in business that when you are in a hole, the first thing you do is stop digging. NAS stopped digging that hole when it sold the money-losing contracts to others. There was an ongoing strategy to refocus NAS to digital, electronic and money transportation security business, but those are factual matters that must be developed independent of this challenge to the indictment. What is clear is that the assets NAS could marshal to keep it in business and pay the SBA loan – once the losses stopped – were $426,000 in Employee Retention Credits that could be applied to its debt to the SBA (Exhibit 8) and the significant value of $1,453,649 in losses carried forward (Exhibit 9).

Management believed the new focus on a different security

---

[1] NAS's 2019 tax returns are attached as Exhibit 4.

5

market was a beneficial change, not an adverse change. They believed that the security guard business had created the losses for NAS and would continue, which connects to the next significant asset that NAS has: a meritorious claim against the Louisiana State Board of Private Security Examiners and two of its officers in which NAS claims more than $4 million in damages.

Four years of litigation in that case led to the attached Order from the District Court for the Middle District of Louisiana setting forth the largely undisputed facts of the case: an agency of the State of Louisiana summarily revoked the license of and barred NAS from continuing its extensive body of business in Louisiana because one guard was three business days late in renewing his firearms registration. (Exhibit 10.) While such regulatory violations normally incur a fine, in this case the Executive Director of the agency, without any due process, and some 16 days after he became aware of the violation, notified every state agency that they could not continue to do business with NAS. The Louisiana District Court's September 29, 2022, Order states:

> However, genuine issues of material fact preclude resolution of North Atlantic's federal and state procedural due process claims (by summary judgment), as well as punitive damages claims against Blanche, with regard to Blanche's action in advising North Atlantic's customers of the license revocation prior to the Board hearing.
> ###
> (Court Grants In Part and Deny in Part Summary Judgment)
> ###
> It Is Further ordered that by no later than January 5, 2023, the parties shall file either 1) the joint notice of settlement…or 2) a joint motion requesting a new trial date.

6

Ultimately, NAS had decided to abandon unprofitable contracts, refocus its business activity away from guard services, preserve its assets, and recover financially. The sale of the guard contracts was not an adverse change for NAS: it improved NAS's position.

Again, as to the other movant companies, neither their assets nor accounts should be subject to forfeiture or seizure.

## MISUSE OF SBA LOANS

Central to the allegations of misuse of these loan funds is J5 Solutions, LLC, which was incorporated in 2019, well before the SBA PPP and EIDL loan programs in question. (Paragraph 5, Indictment.) The nature of its business was "office of other holding companies" which describes an entity that served as hub for related business such as the ones here. J5 Solutions, LLC, (herein "Solutions") had no revenues and its only function was and is making payment on behalf of all the various J5 companies, which were and are housed in one building and share a number of common employees.

Attached as Exhibit 11 is the NAS note for the EIDL funds, for which Jabari Edwards personally guaranteed the repayment of the funds, placing all of his personal assets, and those of all the companies he owns, at risk for this debt.

Under the terms of the note, "all individuals and entities

7

signing this note are jointly and severally liable." Exhibit 11, Page 2 Paragraph 8. However, at no point in the note does it place specific restrictions on the use of the loan funds. The only restriction is that it must be used for "business purposes." (Exhibit 11 page 2, paragraph 9.) There is a catch-all single sentence about the expenditure of funds:

    9.    Misuse of Loan Funds: Anyone who wrongfully misapplies any proceeds of the loan will be civilly liable to SBA for one- and one-half times the proceeds disbursed, in addition to other remedies allowed by law.

Only civil penalties are envisioned for errors in expenditures.

Next these movants scrutinized the expenditures the government infers were violations of law.

Paragraph 35 of the Indictment makes these allegations:

1) On January 25, 2021, $567,522.50, in NAS PPP funds were transferred to J5 Solutions.

2) On January 25, 2021, Solutions transferred $119,014.02 to J5 GBL, and Edwards withdrew $83,014.02 for an official check payable to Mississippi Department of Revenue for payment of taxes.

While these events actually occurred, there is no allegation that $119,014.02 or $83,014.02 were illegally spent in any way.

Paragraph 36 of the Indictment alleges that Solutions

8

transferred $209,392.79 to J5 GBL with notation "payoff for property at 451 Officer Lake Road, Attn: Nathan Smith." This property was made subject of forfeiture with the implication that EIDL funds were used to complete this transaction. The true source of the funds was a bank loan which refinanced a then-existing loan. (Exhibit 12.)

Paragraph 37 of the Indictment continues this pattern of stating facts without any indication of illegal conduct, or the source of the funds. It states that on June 10, 2021, $48,000.00 was transferred from Solutions to Edwards' personal account. There is no allegation that the funds were EIDL proceeds or that the transfer was in any way prohibited. Indeed, the day before this transaction, on June 9, 2021, Greenfield Environmental Multi-state Trust (herein "The Trust") wired J5 GBL a payment for work performed in the amount of $109,394.41. (Exhibit 13). The movants subject to the claims of the government were not put on notice by the indictment as to what the government asserts the prohibited acts were.

Similarly, in Paragraph 38 of the Indictment, it is alleged that, on July 9, 2021, J5 GBL transferred $125,000.00 to The Bridge Group. Once again, there is no claim that the NAS EIDL loan funds were involved or that the transfer was prohibited. The United States has all the banking records of all the companies, which clearly show that on July 7, 2021, J5 GBL received a payment from The Trust for $434,675.17. (Exhibit 14.) Even had EIDL

loan funds actually been used, there is nothing that suggests it was a violation of the EIDL contract or SBA regulations, much less a crime. However, in this case, neither SBA nor NAS funds appear to have been used. The parties subject to the indictment have no way of knowing what they are charged with in this Count of the indictment because the indictment lacks sufficient detail to put them on notice as to what law or laws they have allegedly broken.

Paragraph 44 of the Indictment presents only a chain of expenditures at or near the time NAS received the $350,000.00 second EIDL funds.

1) October 26, 2021, NAS receives $350,000.00 from SBA
2) October 26, 2021, NAS transfers $319,000.00 to Solutions
3) October 27, 2021, J5 Solutions transfers $20,500.65 to J5 GBL
4) November 1, 2021, J5 Solutions transfers $68,500.00 to J5 GBL
5) November 3, 2021, J5 Solutions pays Jackson State (JSU) $16,000.00
6) November 7, 2021, Solutions pays JSU Tigers $29,000.00

Again, the United States make no allegation as to why these normal business transactions are illegal. The first four are clearly business transfers between sister companies. The last two transactions, related to JSU, were part of a paid advertisement

with a university and its athletic program. (See, Advertisement Package Exhibit 15.) Essentially, the United States has failed to provide sufficient notice as to the conduct that constitutes a violation of law.

Paragraphs 49-53 of the Indictment revolve around the final EIDL loan received by NAS in the amount of $1,500,000.00 on November 7, 2021. While the statement is true, it tells movants nothing. The funds were held in the Edwards Enterprises account. J5GBL, Bridge Group and Edwards Enterprises EIDL loan proceeds were also deposited and held in that same account. (See, Exhibit 16.) Subsequently, the funds were transferred to the affiliated companies and used for allowable business purposes, which the government does not dispute except for the following:

1) There were multiple transfers to sister companies.
2) There were bonus checks issued on December 9, 2021, to employees Antwann Richardson ($30,000.00), Shanta Blakney ($20,000.00), Sophia Erby ($20,000.00) and Jewel Edwards ($12,000.00).
3) There was a payment made of $59,000.00 for "Court Square Towers Transaction".

Of course, there were transfers to other companies because multiple companies had funds stored in the account.

Additionally, there were no restrictions on how the funds were to be used or stored as long as the use thereof was business

11

related. (Exhibit 17.) The United States has made no allegations that any of the transfers to sister companies were not business related or even impermissible under the terms of the notes to SBA. As for end of year bonuses, the giving of bonuses is an ordinary business practice. The government has not even stated what provision on the loan contract was violated for a civil claim and certainly not for an alleged crime.

Finally, had it occurred, using EIDL funds to purchase Court Square Tower is certainly business related. What is illegal about doing so? Nothing, as businesses purchase buildings on a daily basis int eh United States. However, the actual purchase of "Court Square Towers" was a cash-less transaction. See Exhibit 18, which has been already provided to the United States.

The EIDL loans were guaranteed by Edwards and, as a result of him being the sole owner of all the other companies, they all stand liable for the debt. There is, as a practical matter, joint and several civil liability for the debt.

### ARGUMENT

Rule 7(c) of the Federal Rules of Criminal Procedure requires that the indictment be a plain and concise statement of the essential facts. By essential the Rule means clearly stated facts that allege all the elements that constitute a crime. In *Van Liew vs. US,* 321 F.2d 664 (5th Circuit, 1963), the Court summarized the well-developed law and legal tradition on this concept:

> The guidelines for determining the sufficiency of an indictment have been established for so many years that they are no longer open to question. We do not think it would be helpful to set out the many ways in which the rules have been stated. The rule as stated in 1833 was that "in all cases, the office must be set forth with clearness, and all necessary certainty, to apprise the accused of the crime with which he stands charged." *United States v. Mills*, 1833, 7 Pet. 138, 32 U.S. 138, 142, 8 L.Ed. 636. Recently, the criteria were reiterated with emphasis in *Russell v. United States*, 1962, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, At P. 289, 40 L.Ed.2d 240.

Paramount among considerations are the requirements of notice and double jeopardy. "It is the protection to the citizen against unfounded charges. Little may be left open to construction or interpretation of an indictment." *Van Liew*, at p. 669.

In *Van Liew*, the conspiracy and wire fraud counts were grounded in business activity. Much like here, the alleged conspiracy and wire fraud depended upon contravening a statute or regulation promulgated by an agency. Further, an indictment cannot be cured by a Bill of Particulars when it fails to state a valid offense.

Here, the underlying offense must be founded on the Small Business Administration EIDL loan from a program created by the Cares Act. For there to be an offense, the indictment may identify the specific regulation or guideline the defendant violated. Generally, statements such as making "false and fraudulent PPP and EIDL applications and agreements" are insufficient.

Further, the government must look into the regulations and

13

rulings of the agency. US v. Robinson, 811 F.Supp 1174 (S.D. Miss. 1993). There, the Court had to look to an IRS ruling to make a finding about the sufficiency of the indictment.

This Court must look to the SBA guidelines. Accordingly, when the SBA guidelines direct the applicant to use numbers from filed tax returns for 2019 or 2020, then the government's indictment of defendants for falsely stating payroll numbers and amounts must state the year used. For the indictment to be sufficient it must state that the payroll amounts were falsely stated for the year Defendant selected. If the indictment merely states a number of employees and payroll amounts without giving the year or month of the alleged offense, the Defendant has not been provided with sufficient notice of what offense he is alleged to have committed. Indeed, as shown by the guidelines attached, the indictment fails to even state a crime.

Similarly, when the government claims that NAS falsely stated that there had been "no substantial adverse change" simply because it had sold all the security guard contract begs the question. Of course it was a change, but change does not equate to an adverse change. In fact, the change was to salvage the company from contracts losing money every month, and to refocus the business in a more lucrative field of operations.

As to the claims that defendant misused SBA loan funds under indictment Sections B and D, Misuse of Funds, the government lists a series of transactions without stating how any were a violation

14

of a guideline or regulation imposed upon the loan funds by the SBA. Merely listing transactions without indicating why each violated SBA guidelines leaves the Defendant to speculate, guess and conjure up what the indictment means.

J5 GBL, LLC, J5 Solutions, LLC, Edwards Enterprises, LLC, The Bridge Group, LLC, BH Properties, LLC and Build Development Group, LLC, respectfully request to be relieved from the obligation of filing a supporting memorandum of authorities.

## CONCLUSION

For these reasons, the parties move to dismiss the indictment as to the forfeiture and seizure counts with respect to the movant companies.

Respectfully Submitted,

J5 GBL, LLC
J5 Solutions, LLC
Edwards Enterprises, LLC
The Bridge Group, LLC
BH Properties, LLC
Build Development Group, LLC

BY: *Wilbur O. Colom by Deyna Smith w/ permission*
WILBUR O. COLOM
MS BAR #6403
POST OFFICE BOX 101
COLUMBUS, MS 39703
wil@colom.com

15

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Motions to Dismiss Forfeiture Counts and Seizure of Property was served via electronic service as agreed by the parties.

/s/ Wilbur O. Colom
Wilbur O. Colom